FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

OCT 1 1 2007

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA EX REL., ALON
J. VAINER, M.D., and DANIEL D. BARBIR

     PLAINTIFFS

Vs.

DAVITA, INC. and GAMBRO HEALTHCARE,
INC., GAMBRO AB, FRESENIUS MEDICAL
CARE AG & CO. KGaA, FRESENIUS USA, INC.,
FRESENIUS MEDICAL CARE HOLDINGS, INC.
and their respective subsidiaries and affiliated
companies

     DEFENDANTS.

CIVIL ACTION FILE
NO. **1:07-CV-2509**



**FILED UNDER SEAL**

## COMPLAINT

COMES NOW, Plaintiffs/Relators in the above-styled action, by and through their

counsel of record and states that this is an action brought on behalf of the United States of

America by ALON J. VAINER and DANIEL D. BARBIR ( collectively "Relators") against the

above defendants (hereinafter collectively referred to as "Defendants" pursuant to the *Qui Tam*

provisions of the Civil False Claims Act, 31 U.S.C. §§ 3729-33.

### JURISDICTION AND VENUE

1.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 and 31 U.S.C.

§ 3732(a) and 3730.

2.

Venue is appropriate as to each Defendant, in that one or more of Defendants can be found in, reside in, and/or transact business in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendants in this judicial district. Therefore, within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper. Relator has made voluntary disclosures to the United States Government prior to the filing of this lawsuit with the United States Government as required by 31 U.S.C. Sec. 3730(b)(2). This Court has jurisdiction to entertain a *qui tam* action. Relator is an "original source" and brings this action in the name of the United States as contemplated by the FCA, 31 U.S.C. §§ 3729-33.

## THE PARTIES

3.

Plaintiff, ALON J. VAINER, M.D. is a citizen of the United States of America. He is a resident of Fulton County, Georgia. Plaintiff brings this *Qui Tam* action based upon direct and unique information obtained during the period of his employment Since 1994 as a Medical Director of numerous dialysis clinics owned and operated by Defendants Gambro and DaVita., which will be described hereafter with specificity. ALON J. VAINER, M.D. is presently the Medical Director of DaVita Healthcare/North Fulton, Atlanta, Georgia and DaVita Healthcare/Cumming. He is formerly Medical Director for DaVita Healthcare/Ford. He is a physician affiliated with Nephrology & Hypertension Consultants, Inc., Atlanta, Georgia. He is a board certified nephrologist and licensed by the State of Georgia. He is a Diplomate in the American Board of Internal Medicine and an Assistant Clinical Professor of Medicine at the Medical College of Georgia. Individually, he is referred to hereafter as "Relator Vainer".

2

4.

Plaintiff, DANIEL D. BARBIR (hereafter "Relator Barbir"), is a citizen of the United States of America. He is a resident of Fulton County , Georgia.

5.

Relator Barbir is presently employed as a hemodialysis RN/Level IV Nurse Manager at Emory Crawford Long Hospital in Atlanta, Georgia. During the period 2000 through 2006, he was employed by Gambro Healthcare/DaVita Cumming Georgia as the Clinic Director. During the period 1997 through 2000 he was employed by Gambro Healthcare in Atlanta, Georgia as a hemodialysis RN. He is a registered professional nurse and licensed through the Georgia Board of Nursing. Individually, he is referred to hereafter as "Relator Barbir".  Relators bring this *Qui Tam* action based upon direct and unique information obtained during their period(s) of employment at dialysis clinics owned and operated by Defendants Gambro and DaVita.

6.

Defendant DaVita, Inc. is a for-profit Delaware corporation, with headquarters in El Segundo, California (hereafter "DaVita"). DaVita provides dialysis services for patients diagnosed with chronic kidney failure.  This condition is also known as chronic kidney disease (CKD). DaVita has over 1,300 outpatient dialysis facilities and acute units in over 800 hospitals. Its clinics are located in 42 states (to include the State of Georgia) and the District of Columbia. DaVita treats approximately 103,000 patients. It is the the largest independent provider of dialysis services in the United States. This defendant is subject to the jurisdiction of this Court.

7.

Defendant Gambro AB and its subsidiary, Gambro Healthcare, Inc. (hereafter "Gambro") are foreign corporations with principal headquarters at Scheelevagen 34, 220 10 Lund, Sweden.

Defendant Gambro Healthcare, Inc., during the relevant times described hereafter, owned and operated hundreds of dialysis clinics in the United States, to include the State of Georgia. Gambro Healthcare, Inc. sold its United States clinics to Defendant DaVita, Inc. in December 2005. For purposes of this litigation, it is believed that Defendant DaVita has successor liability for the wrongful acts of Defendant Gambro Healthcare, Inc. These defendants are subject to the jurisdiction of this Court.

Defendants FRESENIUS MEDICAL CARE AG & CO. KGaA, FRESENIUS USA, INC., FRESENIUS MEDICAL CARE HOLDINGS, INC. (herafter "Fresenius") are affiliated foreign corporations, who are the world's largest providers of dialysis products and services, to include owning and operating dialysis clinics in the state of Georgia and the United States, who are subject to the jurisdiction of this Court.

## MEDICARE BACKGROUND INFORMATION

### 8.

The Medicare Program (hereinafter "Medicare") is a Health Insurance Program administered by the Government of the United States that is funded by taxpayer revenue.  It is overseen by the United States Health and Human Services Department.  Medicare was designed to assist participating states in providing medical services and durable medical equipment to persons over sixty-five (65) years of age and others that qualify for Medicare.

### 9.

The Medicaid Program (hereafter "Medicaid") is a Health Insurance Program administered by the Government of the United States that is funded by State and Federal taxpayer revenue.  It is overseen by the United States Health and Human Services Department.  Medicaid was designed to assist participating states in providing medical services, durable medical

equipment and prescription drugs to financially-needy individuals that qualify for Medicaid.

10.

The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty days or longer. The program is administered by the Department of Defense and funded by the federal government.

11.

The Civilian Health and Medical Program of the Veterans Administration ("CHAMPVA") provides similar benefits for spouses and children of veterans who are entitled to VA permanent and total disability benefits and to widows and children of veterans who died of service-related disabilities. The program is administered by the Department of Defense and funded by the federal government.

12.

Medicare, Medicaid, Champus and Champva will be collectively referred to herein as the "Government" or "Government Payors".

## FCA CAUSES OF ACTION

13.

The False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) makes knowingly presenting, causing to be presented, or conspiring to present to the United States any false or fraudulent claim for payment a violation of Federal Law punishable by three (3) times the amount of the actual damages the government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999).

14.

The FCA, 31 U.S.C. § 3729(a)(2) makes knowingly presenting, causing to be presented, or conspiring to make or use a false record or statement to get a false or fraudulent claim paid or approved by the Government a violation of federal law punishable by three times the amount of the actual damages the Government sustains and a civil monetary penalty of between $5,000 and $10,000 per claim ($5,500 and $11,000 for claims made on or after September 29, 1999). The FCA, 31 U.S.C. 3729(a)(3) makes it unlawful for defendants to conspire to violate the FCA.

15.

In this case, Defendants have, in reckless disregard or in deliberate ignorance of the truth or the falsity of the information involved, made, used, caused to be made or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of *inter alia* 31 U.S.C. § 3729(a)(1) and (a)(2).

16.

Further, Defendants conspired to violate the FCA and to defraud the Government. Therefore, 31 U.S.C. Sec 3729(a)(3) is applicable to this action as well.

## **FCA DEFINITIONS**

17.

The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

18.

For purposes of the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

19.

The fraudulent billing practices and actions of the Defendants described hereafter relate to acts of Defendants which caused the submission to the Government of false and fraudulent claims by physicians, clinics, medical providers and medical facilities for otherwise non-reimbursable charges relating to dialysis drug wastage and overcharging for Epogen.

20.

The purpose of the fraudulent schemes described in the following paragraphs hereafter was to obtain reimbursement by the Government and other private insurers. Because of the actions of the Defendants, these medical providers have submitted fraudulent claims for reimbursement through the unlawful and fraudulent conduct hereafter described in express violation of federal and state statutes, rules and regulations.

21.

The scope of the Defendants' fraudulent activity is spread throughout the United States.

**I.      PERTINENT CMS REGULATIONS REGARDING THE DOSING AND WASTAGE OF DIALYSIS MEDICATIONS AND SUPPLEMENTS.**

**A.      MEDICARE REIMBURSEMENT FOR SEPARATELY BILLABLE DRUGS INCIDENT TO DIALYSIS TREATMENT**

Medicare covers dialysis for individuals with end-state renal disease, a condition of permanent kidney failure. CMS pays for certain dialysis services under a type of bundled rate methodology, called a "composite rate" and additionally and separately for certain dialysis-

related drugs on a separate rate per dose each time the drug is administered. These drugs are referred to as "separately billable" and are presently (since Jan 1, 2005) paid at six (6) percent above manufacturers' average sales price (ASP).[1]

CMS pays for the dosage in fact administered and given to patient. As to single-use dose vials, CMS will also pay for the unused portion (wastage) of the single dose vial under certain specific conditions. The wastage of the dosage must be unavoidable. CMS customarily pays 80% and the Medicare patient or his or her secondary government payor or private insurance carrier pays the remaining 20%. In many instances, the 20% co-pay is paid by Medicaid as the secondary payor. Thus, additional unlawful reimbursements are incurred by the Government payors such as the Medicaid Program in addition to the losses caused by excess wastage to the Medicare Program.

## B.   MEDICARE REIMBURSEMENT GUIDELINES AS TO SINGLE DOSE VIALS AND WASTAGE

Medicare will reimburse providers for the actual dosage administered and the excess unused portion ("wastage") if there were reasonable efforts made to minimize wastage. The following references detail the evolution of Medicare guidance as to how and when wastage is appropriately reimbursed.

### (1)  MEDICARE  BULLETIN #1916 July 5, 2000

"*Drug Wastage: In some cases the physician or physician extender must discard the remainder of the drug vial after administering a dosage to a Medicare patient. In these cases, Medicare covers the amount of drug discarded along with the amount of drug administered, The medical record must contain documentation showing the amount of drug administered and the amount of drug discarded.*"

### (2)   CDC Guideline, April 27, 2001:  Drugs must be administered by a licensed professional; all doses from a given vial should be drawn-up and administered  within a 4-hour period;

---

any opened vials or filled syringes must be discarded if not used within 4 hours of first

puncture of the vial. Documentation is required in the patient file; residual amounts of these

medications must never be pooled with medication from another vial or syringe.2

**(3)  CMS PROCEDURE DEVELOPED WITH APPROVAL OF CDC, July 5, 2002:**

"With appropriate procedures, it is now safe to reenter a medication vial labeled as single

use." "We expect this procedure to be used whenever feasible for efficient use of

medications."

**(4)  MEDICARE BULLETIN #2035, November 14, 2002:**  Drug Billing: Wastage.

*As noted in previous edition of the "Medicare Alert Bulletin", Medicare does reimburse in instances of unavoidable drug wastage. We have noted occurrences of billing for "wastage" when in fact the wastage was avoidable. We expect providers to order and maintain stock of the medications in the amounts most commonly utilized resulting in the least possible wastage. For example, if a medication is available in 2 mg and 4 mg ampules, it would be inappropriate to maintain stock of only the 4 mg ampules when in fact 2 mg was the most commonly prescribed dosage Administration of the drug plus the amount wasted must be documented in the medical record., Failure to document the wastage may result in denial of that amount "*

**(5)   MEDICARE BULLETIN #2033, DATED OCT 11. 2002, "Drug Wastage"**

Clear documentation must be present in the medical record to support the  billed amount

for wastage.

'*The most appropriate size, given the MD order, must be utilized for the patient. Ensuring availability of the most frequently used medication amounts will ensure minimal wastage. Wastage will not be covered when a provider has utilized a larger dosage because a smaller, more appropriate size was not on hand. An example: The MD most often orders 2 mg of a specific drug and the clinic stock only the 4 mg vials. The medication is available in both the 2 mg and 4 mg vials. In this instance, it is inappropriate for the clinic to bill for wastage when using the 4 mg vial, when in fact wastage was avoidable "*

**(6)  MEDICARE BULLETIN #2057, April 7, 2003 (Georgia FI)**

CMS again expressly authorizes reuse of single dose vials.  CMS specifies that re-entry into

to single dose vials is expected.

---

2  As noted below, in Medicare Bulletin #2057 on April 7, 2003, the rule against re-using dosages in a single-dose vial was reversed.  The new rule encouraged the use of the residual dosage to reduce wastage unless the wastage was "absolutely unavoidable".

*"The FI expects ESRD clinics to plan drug administration responsibly to ensure prudent, efficient utilization of medications. Only in those circumstances when wastage is <u>absolutely unavoidable</u> would we expect to see wastage billed on a claim."*

(7) **MEDICARE ALERT BULLETIN #2203, DEC 14, 2006; page 11; "WILL MEDICARE REIMBURSE FOR DRUG WASTAGE WHEN WASTAGE IS UNAVOIDABLE?"**

*"Yes, Medicare will reimburse for drug wastage when wastage is unavoidable  However, there must be clear documentation present in the medical record to support the billed amount. ....The most appropriate size, given the MD order, must be utilized for the patient  Wastage will not be covered when a provider has utilized a larger dose because a smaller, more appropriate size was not on hand."*

(8) **CMS MANUAL SYSTEM, PUB 100-04 "MEDICARE CLAIMS PROCESSING", TRANSMITTAL 1248, DATED MAY 25, 2007**

**SECTION 100.2.9 –    Submission of Claims with the Modifier JW, "Drug Amount Discarded/Not Administered to any Patient"** (Effective Date: July 1, 2007)

"General Information": *"Medicare will cover the amount of a drug or biological that was discarded along with the amount of the drug or biological that was administered for single use vials or single use packages."*[3]

Chapter 17, Section 40 – Discarded Drugs and Biologicals (Rev 1248, issued 05-25-07: Effective 07001-07)

*"The CMS encourages physicians, hospitals and other providers to schedule patients in such a way that they can use drugs or biologicals most efficiently, in a clinically appropriate manner. However, <u>if a physician, hospital or other provider must discard the remainder of a single use vial</u> or other single use package after administering a dose/quantity of the drug or biological to a Medicare patient, the program provides payment for the amount of drug or biological discarded along with the amount administered up to the amount of the drug or biological as indicated on the vial or package label "*

---

[3] Before CMS will reimburse for wastage, the wastage must be unavoidable as per Medicare Bulletins #2057 and #2203, et al.  Also, the scheduling of patients must be done efficiently in order to minimize wastage

## II.     FACTUAL SUMMARY OF DEFENDANTS' UNLAWFUL MISCONDUCT

22.

This is a civil action brought by Relators on behalf of the United States against the

Defendants pursuant to the Federal False Claims Act, 31 U.S.C. § 3729-33.

23.

The Defendants have systemically, on a local, regional and national basis, fraudulently

manipulated the frequency, dosage, selection of the drug vendor and size of purchased single use

vials to be used in the injection and administration of the dialysis drugs, FERRLICIT,

VENOFER and ZEMPLAR and other drugs (e.g., Epogen and Hectorol, see below) which are

generally referred to as "separately billable drugs" ancillary to dialysis treatment at dialysis

clinics across the United States.

24.

In the beginning of 2004, during the March-July timeframe, Relators noticed a strong

push to increase pharmacy revenue for then Gambro Healthcare outpatient dialysis clinics.

25.

Relator Barbir worked for Gambro Healthcare Cumming as the clinic director from 2000

until 2006 when he resigned from DaVita (fka Gambro). Dr. Alon Vainer was the Medical

Director of the clinic.

26.

Every month Relator Barbir had a CD-Meeting (clinic director meeting) with the Clinic

Directors, the Regional Directors, and sometimes the Quality Improvement/Educator for the

region as well as the Regional Vice President for the region. Relator Vainer was not present at

these meetings.  At times, Relator Barbir met with the Regional Vice-President for the entire

division. At the meetings, many aspects of the dialysis business, including budget issues, how to maximize pharmacy revenue,etc. were discussed. The Regional Directors kept minutes of the meetings.

27.

In the summer of 2004, Relator Barbir had a CD-Meeting at the regional office at the Southern Lane-Gambro clinic in the training room. One of the major issues discussed was anemia management (specifically the use of iron supplements with the dialysis patients). At the clinic level, Gambro was using the Ferrlecit product for iron replacement therapy for ESRD patients. During this meeting, the attendees, including Relator Barbir, were told that they needed to convert all patients from Ferrlecit to Venofer because the reimbursement for Venofer was greater than the reimbursement for Ferrlecit. They were told that one of the advantages of using Venofer instead of Ferrlecit was that it came in a bottle instead in a vial. However, the primary reason for the switch was that the pharmacy reimbursement is greater with Venofer. Relator and the others in attendance, were told that instead of giving 8 doses of Ferrlecit (125 mg/dose) for a cycle of iron replacement, they should give 10 doses of Venofer (100 mg/dose).

28.

The other directive was to decrease every patient's dose to a smaller dose which was to be given weekly. Since Gambro was reimbursed per/vial, the more vials used (regardless of the waste amount), the greater Gambro's pharmacy revenue would be. So, if they had a patient who had been receiving one vial of iron/month, they would decrease that dose in 4 and give that weekly. This way Gambro would use 4 vials/month instead of one vial/month. The net effect was the pharmacy billing and reimbursement received  would quadruple.

29.

Relator Barbir raised the question with the management present at the meeting regarding the extra nursing work and the increase in inventory/purchasing for the clinic caused by the push to use smaller doses. Another clinic director raised the question that some physicians will not want to change the iron product. Relator Barbir raised the question regarding the medical justification for the switch and for the splitting of the dose to the smallest dose possible. At that point, one of the Regional Educators/Quality Improvement personnel said to Relator Barbir: "Why are you so stubborn?" Relator Barbir's  Regional Director intervened and said: "Let's call the Regional Vice president to come in and clarify some of these questions."

30.

At that point, the Regional Vice president came in. He said to them, "Guys, you all know that the pharmacy revenue will make you or break you regarding the budget". He also said, "We all want a nice bonus at the end of the year and meeting the budget is a huge part of it." He also said that "if a Medical Director objects to this, we should have them call the Regional Directors or him personally". He said that this comes from up above him from the Division VP and that the Division VP will be visiting every clinic in the state.

31.

Relator Barbir and staff were told by the Regional VP and the QI/Educators to go to the clinics and tell the physicians that we have new protocols and to write orders regarding changing the dose to the smallest dose possible. We were specifically told that this directive comes from "up above the Division VP and that they are not playing. They want to see change immediately."

32.

Relator Barbir  went back to the clinic and  told Relator Vainer that Relator Barbir felt uncomfortable with what Relator Barbir was told to do. Relator Barbir told Relator Vainer that he  believed that he was being asked to commit fraud. Relator Vainer told him not to conform to the Gambro directives if he felt it was wrong.  However, Relator Vainer had no control over the

Gambro protocols at issue.  Gambro controlled the dosage amounts and intervals.

33.

Relator Barbir told Relator Vainer that we were not given any medical justification for the splitting of the dose or the change of the iron product. Relator Barbir told Relator Vainer that we did not have any patients who had any problems with the iron product Gambro was using (Ferrlecit) in his clinic and that he had experienced excellent results.  Relator Vainer himself passed these concerns on to Gambro, to no avail.

34.

Since Relator Barbir had great results with anemia in the clinic, he resisted making the changes immediately. However, a couple of months later, Relator Barbir was told to do it or there would be in trouble. Relator Barbir told his secretary who was in charge of inventory, the nurses, the dialysis techs, the dietitian and the social worker about the push for pharmacy additional revenue increase and to expect the changes described above. Relator Barbir  told them that he was under too much pressure and that he would have to do what he was told. Relator Barbir  did not have the authority to resist these orders from his superiors.  He objected to the orders to his immediate supervisors, but his protests were ignored.

35.

A couple of months later at the CD meeting, Relator Barbir and staff were told to be aggressive in the dosages used with another product (Zemplar). Zemplar is used in ESRD patients to treat high PTH. In this case, they were given new charts to use in administering Zemplar.

36.

Again Relator Barbir and staff were directed  to waste product in order to increase revenue. Any Zemplar dose up to 2 mcg was to be drawn from a vial of 2 mcg. Any Zemplar dose over  2 - 5 mcg was to be drawn from a vial of 5 mcg. Any Zemplar dose over 5 mcg was to be drawn from a vial of 10 mcg.

37.

Relators and other clinic directors questioned the Regional Directors and the QI/Educators regarding the waste. They asked why they were not going to be allowed to combine vials to make the right dose and reduce wastage? They were told that it comes from up above and if they have any questions they could ask the division VP. Relators.  The Gambro staff was made

14

to understand that the decision was being made at the regional and national level, and therefore, this protocol could not be altered locally. Unlike Epogen, where it was allowed to combine vials, with Zemplar they were told not to combine vials. This was a conflicting practice with no legitimate justification.

38.

After implementing the new Zemplar charts, Relators and staff were told to increase the dosages by .5 mcg so that Gambro could use more vials of 5 mcg instead of 2 mcg. Relator Barbir actually was told that he had too many patients who were using 2 mcg vials and that he needed to make the necessary changes. Relator Barbir asked the dietitian to check to see if their patients were dosed appropriately before increasing the dosages by 0.5 mcg. She checked and said that they were. As directed, Relator Barbir went to his dietitian and told her to check all the patients who were using the 2 mcg vials and to see which patients they could unilaterally designate for the increase by 0.5 mcg in order to use the larger 5 mcg vial. Although it was not medically needed, Relator Barbir and staff increased the dose by 0.5 mcg in order to accomplish what they were told. Again, they had no choice but to comply. Relator Barbir complained about this practice at the CD meeting, but his superiors directed that all the CDs uniformly implement the protocols.

39.

At the same time, a nurse who came from another DaVita clinic came to work in the DaVita clinic where Relators worked for a couple of days/week. This nurse was surprised to see that they used Zemplar vials of 2, 5, and 10 mcg. She said that in her DaVita clinic they use only the 10 mcg vials in order to increase the billing/reimbursement by wasting from the vial of 10 mcg regardless of the dose given or needed.

40.

Based upon Relators observations, it appears that the above practices continue to the present time with small changes.

## III  COMPLAINT COUNTS

### COUNT I

#### I. DEFENDANTS GAMBRO AND DAVITA FRAUDULENTLY OBTAINED EXCESSIVE DRUG REIMBURSEMENT THROUGH A NUMBER OF SCHEMES DESIGNED TO INCREASE WASTAGE AND UNLAWFULLY INCREASE REIMBURSEMENTS

41.

Gambro and thereafter DaVita directed its clinics and physicians in 2004 and thereafter to change their protocols in order to maximize drug reimbursement for Zemplar, Venofer and Ferrlicit as follows:

(1) Convert all patients from Ferrlecit to Venofer because the reimbursement for Venofer was greater than the reimbursement for Ferrlecit and to increase the frequency of dosage as to patients. For example, giving 8 doses of Ferrlecit (125 mg/dose) for a cycle of iron replacement, we would give 10 doses of Venofer (100 mg/dose);

(2) Decrease every patient's Venofer (this was also done with Ferrlecit) dose to a smaller dose which was to be given weekly. Since DaVita was being reimbursed per vial, the more vials used the greater the reimbursement  So, if a patient was receiving one vial of iron/month, the clinics were instructed to decrease that dose by 1/4th and give that weekly. Accordingly, 4 vials/month would be used instead of one vial/month. Wastage would be quadrupled.

(3) By selecting greater vial sizes (even though smaller sizes were available to reduce wastage), regardless of the waste amount, the larger pharmacy revenues would be. By wasting the drug product, you increase revenue. DaVita directed its clinics to select larger vial sizes to maximize wastage and thereby obtain greater reimbursement .4  Any Zemplar dose up to 2 mcg was to be drawn from a vial of 2 mcg. Any Zemplar dose over 2 - 5 mcg was to be drawn from a vial of 5 mcg. Any Zemplar dose over 5 mcg was to be drawn from a vial of 10 mcg.

(4) Increase the Zemplar dosages by .5 mcg so clinic would use more vials of 5 mcg instead of 2 mcg. Additionally, some DaVita clinics used only the 10 mcg vials in order to increase the billing/reimbursement by wasting from the vial of 10 mcg regardless of the dose given. The Georgia Clinic used only the 10 mcg vials over extended periods of time.

(5) Require all clinics to discard "wastage" from the vial of patient for another patient even if other patients are readily available to use the unused portion of the vile within the 4-hour "re-entry to vial" period;

(6) Do not coordinate patient schedules so as to allow for sharing of unused portion of vials. Coordination of patient schedules and sharing unused portions among the patients would have decreased wastage and lowered reimbursement paid by Medicare.

42.

As a result of these schemes, Medicare and the other Government payors incurred

16

significant damage and continue to do so to the present time.

## COUNT II

### DEFENDANT FRESENIUS FRAUDULENTLY OBTAINED EXCESSIVE REIMBURSEMENTS FOR IRON SUPPLEMENTS BY UNNECESSARILY INCREASING AVOIDABLE WASTAGE

Like Gambro and DaVita, Defendant Frensenious implemented illegal schemes to increase its revenue by increasing iron supplement wastage. Frensenious selected greater vial sizes of iron supplements even though smaller sizes were available which would have reduced wastage.

43.

Frensenious also directed its clinics to throw away wastage from single-dose vials. They were told not to mix the remaining dosage left from any particular patient with the dosage for another patient.

44.

As was the case with Gambro and DaVita, all of the iron supplements provided at the Fresenius clinics which was not directly used with a single patient was thrown away. This amount of excess wastage was clearly avoidable.

45.

Finally, like Gambro and DaVita, Frensenious did not coordinate patient schedules in an efficient fashion which would have allowed them to share the unused portion of the iron supplements vials. This conduct directly violates the law, CMS guidelines and the directives referenced previously herein.

46.

---

4 The profit from wastage is a result of the "spread" between the amount paid by Defendants for these drugs (which is reduced because of huge volume discounts) and the amount paid by Medicare (ASP plus 6%).

As a result of this conduct, the actions of Fresenius caused damage to Medicare and the other Government payors and continue to do so to the present time.

## COUNT III

## DEFENDANTS  GAMBRO AND DAVITA FRAUDULENTLY BILLED GOVERNMENT FOR "OVER-FILL" OF EPOGEN

### 47.

Epogen (Epoetin alfa) is a glycoprotein which stimulates red blood cell production. Each 1 ml of solution contains 2000, 3000, 4000 or 10,000 Units of Epoetin alfa. It is available  in the following packages: 1 ml Single-Dosage, Preservative free solution in 2000, 3000, 4000, 10,000 and 40,000 units; 2 ml Multidose, Preserved solution in 10,000 units and 1 ml Multidose, Preserved solution in 20,000 units. Epogen is manufactured by Amgen, Inc.

### 48.

The overfill scheme involved the following:  Amgen over-fills the 1 ml single dose vials with up to 10% to 20% greater volume per package. Gambro and DaVita knew this. This 10% to 20% overfill is purportedly to allow for insuring that the minimum stated packaging gets to the patient. This 10% to 20% overfill is not charged to DaVita.

### 49.

Prior to 2004, Gambro urged its physicians to prescribe in all instances dosages so that 20% overfill could be charged.

### 50.

After 2004, DaVita urged its physicians to prescribe dosages so that 10% over-fill can be charged to payors. Gambro and DaVita then had its employees capture all of the Epogen in the vial package (to include the 10% to 20% over-fill) and inject every drop of the Epogen in its patients (without any wastage).

51.

Gambro and DaVita bill Medicare 80% (and the patient 20% for co-pay) for not only the stated volume on the vial package, but also the over-fill. The true purpose of the over-fill is to provide free Epogen to Gambro and DaVita which can be billed to Medicare and co-payors.

52.

By way of example, the DaVita physician routinely prescribes 2200 units. DaVita uses the 1 ml 2000 Unit package. The patient receives the full 1 ml vial of 2000 Units, but it is documented in the patient file as if the patient received 2200 Units. Medicare is billed for 2200 units. DaVita only purchased 2000 units (1 ml vial, 2000 Unit) but receives payment for the 2000 plus the purported 10% over-fill. No assurance exists that the 10% over-fill was given to patient. Even though there is no assurance that the full 10% over-fill is in fact in the vial package (it can vary from 1% to 10%), DaVita bills for the full 10% even if the patient receives less.

53.

DaVita pressures its physicians to prescribe dosages that would allow including the 10% over fill (even if it is not there). Thus, DaVita is charging up to 10% more volume that it shows that it purchased from Amgen.

54.

This is also problematic because this 10% over-fill (free to DaVita) is not reported as a discount or rebate by the manufacturer to CMS for computing the ASP (average sales price). Similarly, Defendant Gambro fraudulent billed the Epogen overfill by the above billing scheme.

55.

The actions of Defendants Gambro and DaVita in the preceding paragraphs caused damage to Medicare and the other Government payors and continues to do so to the present time.

56.

The United States of America, unaware of the falsity of the claims and/or statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and/or statements, paid for drugs or drug wastage, provided or not provided to individual patients insured by federally-funded health insurance programs, including Medicare. Had the United States known that the bills caused to be presented by Defendants for payment were false and misleading, payment would have not have been made for such claims.

**WHEREFORE**, Plaintiffs/Relators, acting on behalf of and in the name of the United States of America, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

(a) For treble the amount of the United States' damages, plus civil penalties of Eleven Thousand Five Hundred Dollars ($11,500) for each false claim referenced above;

(b) For all costs of this civil action;

(c) That Plaintiff be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

(d) That a trial by jury be had as to the allegations against each Defendant set forth herein;

(e) That the Plaintiff and the United States receive such other and further relief as this Court deems to be just and equitable.

This  _11_  day of October, 2007.

Respectfully submitted,

WILBANKS & BRIDGES, LLP

Marlan B. Wilbanks
State Bar No. 758223

20

Ty M. Bridges
State Bar No. 085000

Attorneys for Relators
Monarch Plaza
3414 Peachtree Road NE
Suite 1075
Atlanta, Georgia  30326
Telephone:  404-842-1075
Fax:      404-842-0559
mbw@wilbanks-bridgeslaw.com
tmb@wilbanks-bridgeslaw.com

WEISSMANN & ZUCKER P.C.

Scott I. Zucker
State Bar No. 786250

Attorneys for Relators
Weissmann & Zucker, P.C.
One Securities Centre
3490 Piedmont Road, Suite 650
Atlanta, Georgia  30305
Telephone:  404-364-4626
Fax:  404-364-2320
scott@wzlegal.com